Case number 20-5197 et al. Stunning Rock Sioux Tribe et al. v. United States Army Corps of Engineers Dakota Access LLC of Balance. Mr. Maisonnet for Balance U.S. Army Corps of Engineers. Mr. Estrada for Balance Dakota Access LLC. Mr. Hasselman for Appley Stunning Rock Sioux Tribe. Mr. Maisonnet is now unmuted. Good morning, Your Honor. Sorry, shall I begin? Thank you, Your Honor. My name is James Maisonnet. I'll be arguing today for the Army Corps of Engineers. I'm reserving one minute for rebuttal, which the clock already reflects. A district court's decision should be reversed for three reasons. It should be reversed because the district court misapplied the law. It ignored a critical factor under the law, the low risk of an oil spill, and it applied the wrong standard of review. Second, it should be reversed because the Corps' environmental assessment is rational and supported by the record. Third, it should be reversed because it ordered the pipeline to be shut down without making the findings required by the four-factor test for injunctive relief. I'll take those each in order. First, the court misapplied the law by ignoring the low risk of a spill. In cases like New York v. NRC, this court has held that NEPA requires agencies to weigh both the risks and consequences of their actions. So an agency can rationally conclude that the effects of its action are not significant if the combination of risk and consequence is small enough. Doesn't that just beg the question here? I mean, even with the low risk, the question is whether there is a significant controversy over that and the consequences of the risk. Is that true? Yes. Then under national parks, there's an unresolved significant controversy, right? That is the question, Your Honor. I don't believe there is a significant controversy here. The Corps rationally found that there is not. Well, hold on. You said rationally. Did the Corps actually find that there wasn't a controversy? Where did it actually find it? So what the Corps did, Your Honor, yes. And let me just ask you the second half of my question. Yes, Your Honor. Is it the question whether it did or did not resolve the controversy, not whether it rationally concluded that it resolved the controversy? I'd like to take each of those questions in turn. The first is yes, Your Honor. What the Corps did, you know, as I'm sure you're aware, is the Corps prepared an environmental assessment. That was later remanded for further explanation and analysis by the district court. In the memorandum for record that the Corps prepared, which the Corps meticulously walked through all of the criticisms submitted by the tribes and responded to them and explained in each case why the tribes' criticisms hadn't raised, hadn't cast substantial doubt on the Corps' data, its methods, or its conclusions. So that's where the Corps rationally concludes that there isn't a significant, that this is not a highly controversial case. Secondly, as far as resolving controversy— You would say that to be a highly controversial case, it has to not only be one about which there is wide disagreement as to the result or whatever, it has to be a defensible argument that there is a substantial, is a risk. In other words, I guess I'm asking, what is the test for whether there is a highly controversial case, and what is the test for reviewing the finding that there isn't? Yeah, so the test, Your Honor, is, I mean, this is a NEPA case, right? So it's governed by the Arbitrary and Capricious Review. So I think the fundamental question here is, did the Corps rationally conclude that the effects of its action here are not highly controversial in light of the tribes' criticisms? The Corps went through the tribes' criticisms and— Don't you have to clearly show, clearly show— I beg your pardon, Your Honor? Don't you have to clearly show, even within the context of NEPA review, clearly show that an EIS is not needed? So you have to show that you made this rational determination. Sorry, Your Honor. I believe the phrase the Corps used in cases like Semonite is, make a convincing case. Convincing case, okay. Yeah. So here, I believe the Corps made that convincing case because it went through the tribes' criticisms meticulously. It responded to them at length, and it explained why— I apologize. It's convincing case, a more rigorous reasonableness inquiry? How does it intersect with APA review? Yeah, I mean, it's a gloss that the Corps—I believe it's how the Corps have described what the Corps has to do in the context of APA review. I'm aware that that's the language we've used to describe it. I'm asking you what that means, how that affects the nature of what the government has to show here. Yeah, I think what it means in this context, Your Honor, is that the Corps has to make a case that's convincing in light of the tribes' criticism. It has to be rational in light of the tribes' criticism. It's not enough to just say, well, you didn't— That's ordinary arbitrary and capricious review. You have to factor in all the evidence in the record. So that's just throwing out the requirement of a convincing showing. So a convincing showing must require something more than ordinary. Well, I would say that the law doesn't require more than simply a rational decision in light of the tribes' criticisms. But in any event, if there is a higher standard, if there is a standard for a convincing case, I believe the Corps has made it here through its lengthy analysis of the tribes' criticisms. And I think another factor here, Your Honor, is besides—I mean, obviously, the district court seems to have applied the wrong standard. It seems to have what the Corps had to have done was to convince the tribes' experts. Obviously, that can't be the case because that would give heckler's vetoes to anyone who could oppose an action that required federal approval if the tribes themselves agree. Can you help me? I didn't see the district court saying you actually have to persuade everybody who is opposed to this action. That seems to be not the most natural reading of the district court's decision. It seems to me more that within this context, just to lay it out for you if that's okay, what it means by resolving is that you have made a convincing showing that this controversy doesn't necessitate the type of study that an EIS would provide. And we're only trying to figure out here whether there should be an environmental impact study, not whether you can do what you want to do, anything like that. Of whether there should be an environmental impact study. So it seems to me the nature of the showing, the resolution of the controversy has to be when do we need an environmental impact study to probe further on this dispute. That's—or have you cleared—have you made a sufficient showing, a convincing showing that we don't need an environmental impact study to resolve this dispute? That's all it means, I think. Yes. You know, two points you're on, I agree. It's not entirely clear to me what standard the district court did apply. I mean, it does say at one point that arguably under the precedent, the court could find the highly controversial factor met merely by the existence of the tribe's opposition, 1A, 112. And then when it went on to review the specific, the core specific disputes in this case, it never explicitly applied the arbitrary or the convincing case standard. It seemed to fixate on the tribe's opposition. But ultimately, Your Honor, I think the court did make, for the reason— Again, I guess just to be fair to the district court, I wouldn't call it fixating on the tribe's opposition. What it was, what it was discussing was the failure in the district court's view of the core to offer a reasoned explanation of, or reasoned assurance as to why what the tribes were raising doesn't flag a type of substantive controversy over either effects or methodologies that merits further scrutiny under an EIS. That's a job, the district court doing its job, whether rightly or wrongly, that's what we're arguing about. Yeah. Assuming the court, the district court did apply the correct standard, Your Honor, we still think that its conclusions about the core's environmental assessment were wrong, that the core's environmental assessment is rational and makes a convincing case and supported by the record. Fundamentally, the core's analysis here is based both on its analysis of the specific structure and systems of this pipeline, and then confirmed by its analysis of the historical record of pipeline spills and incidents. In contrast, the tribe's criticisms are generally based on the well go wrong, and they end up with worst case assessments. I don't think, I mean, there's different. Isn't that what a worst case scenario is? Yes, Your Honor, NEPA of course doesn't require the core to analyze a worst case scenario. What it did here was use... Right, I understand that, but the core did do worst case scenario analysis, and it did... Excuse me, I'm switching to the phone here. Hold on a minute. Yes, Your Honor. Sorry, I'm sorry. Anne, are you switching me to the phone now? Judge Dado, I have just... Hello? Yes, Judge Dado, I have just had Zoom call you. Oh, I see. Excuse me, my internet's not working here. Why don't you have it done once more, okay? All right, I will do this right now. I know, I have to push one. We did. That was good. Okay. Anne, have you had them call? Zoom is indicating that it is in the process of calling you, and that the call has not been accepted yet. Anne, let's just keep going. I'm sorry about all this. Let's just keep going. I'm sorry about that. I interrupted you in the answer to a question. Yes, Your Honor, I was giving you a 50,000 overview of how good the core's environmental assessment here and how the tribe's criticisms are ultimately about worst case scenarios. You asked me, isn't that what they did? I have to say, no, not exactly. NEPA doesn't require worst case scenario analysis. What the core used was the worst case discharge, which is a defined term under the Pipeline and Hazardous Materials Safety Regulations. Right, that was my point. I agree with you that it doesn't require it, but the core's decision here rests on a worst case scenario. It did do the analysis. And that analysis was a basis for its decision. And there's a controversy over that, isn't there? So there's two aspects, Your Honor. So the worst case discharge, which I don't agree is a worst case scenario. It's a specific methodology used by the Pipeline by PHMSA to create a number that's appropriate for oil spill response plans. It doesn't necessarily assume, for example, that it's the absolute worst accident that could ever occur. Because that analysis, where does it take us? What limits are? I mean, the tribes, for example, argue that the core should assume that a catastrophic pipeline rupture, a full guillotine break in the pipeline, would have continued for eight hours. Now, that gives you an oil spill of something like 200,000 barrels. That's 10 times the size of any oil spill in the historical record that the tribes have identified. It's not a realistic assumption. It's not a sensible assumption. It's not what PHMSA's regulations required. That wasn't the analysis that the core did. The core then confirmed this abstract analysis based on PHMSA's regulations by analyzing the historical records of pipeline incidents and confirming that it had come up with a realistic estimate for the kind of catastrophic spill that might occur in the very unlikely event that the pipeline ruptured. I just wanted to back up to the point you were making to Judge Tatel. I appreciate your distinction between worst case discharge. Not worst case scenario, so we don't assume everything goes haywire. As you said, a term of art under the regulations for the pipeline, PHMSA as everyone's calling it. Can you tell me exactly what a worst case discharge does take into account and what it doesn't? What would a worst case scenario be that a worst case discharge doesn't? A worst case discharge, Your Honor, the specific PHMSA regulation that defines an equation. You figure out where the valves are on the pipeline. You figure out how long a segment of pipeline might ultimately leak out, assuming those valves are ultimately closed. You've got whatever it is, the mile or so that lies underneath the bed of Lake Milwaukee. That's how much oil. All the oil contained in that pipeline, if this ruptures, it's going to ultimately leak out. Then you've got to figure out how long is it going to take to shut the pipeline down because that oil in that segment is definitely going to leak out. More oil is being pumped in all the time, so you've got to shut the pumps down and then close the valves. You need to shut down time. Now, for example, this is one of the cruxes of the dispute with the tribes. What shutdown time do you put in? PHMSA regulations require either the maximum shutdown, and in this case, that number didn't exist because the pipeline had not started operation yet, or the operator's best estimate. PHMSA regulations don't require that when you generate this worst case discharge estimate, you then compound this into a worst case scenario by assuming the longest conceivable shutdown time because what happens if you do that is you quickly end up with a spill estimate that is completely unhistorical and much larger than anything that's actually happened. That's where the core use... The analysis was, and it was just an estimation, was one to three minutes, but your argument has always been about one minute. Your analysis is based on one minute and the range is one to three minutes, and I guess in a pipeline that's going, that can be a material difference. The total shutdown time the core plugged into that equation is 12.9 minutes. This is one of the issues that we think the district court got wrong. It said that the court didn't explain what the pieces of that time were. You can find that discussion at 8 Joint Appendix 2071, but district court seems to have missed that discussion. So, it includes time for detection, shutdown for the operators to respond, and then for the valves. Where is the citation that says it'll take just the one minute that your environmental assessment invoked? What is the citation for one minute? So, one minute for detection is at 8 Joint Appendix 2071. Say again, please. 8 Joint Appendix... Volume 8 of the Joint Appendix, page 2071. That's where the court explains that that 12.9 minutes total from the rupture to shutting the pipeline down includes a minute for detection. And you were able to... I guess you said a minute in your EA. I'm not disputing that. What I'm saying is, what was your authority for one minute? Oh, I see. The scientific background. Right. Well, so that you can find... I mean, this... So, that number was... It's based on the operator's best estimate, as the FEMSA regulations require. It's based on the fact that the pipeline has these pressure sensors that can detect the... Where in that estimate did it say one minute? The one minute number. So, the one to three minute detection time is at 2 JA... Oh, sorry. Second volume... That's exactly my point. The one to three minute detection time. And yet, your analysis is all based on one minute. That's my question is, how did you get from one to three? Well, we'll just go with one in a worst case discharge analysis. Well, so I think the court... So, there's two things to say. First, the court's estimate does already include some padding, right? It includes, for example, it takes only about 30 seconds to actually close the valves. And the court estimated that that would take three... Again, I'm talking about the detection time, because you can't close the valves until you've detected it. So, how did the court explain on this record its basis for relying on one minute, when as you said, the expert to which you were citing said one to three minutes? What happened to the other two minutes? I'm not aware of an explicit discussion of that issue. Is that a problem? I don't think so, Your Honor, because even if it was three minutes instead, and assuming that that would extend the time to 14.9 minutes, you're talking about an additional 823 barrels of oil, which is about a 6% additional increase in the catastrophic spill. And what the tribes have to show here is not just that there's any possible disagreement about these numbers, but that there's a substantial dispute that calls the court's ultimate conclusion into question. And of course, all of this then has to be discounted for the very low risk that this kind of spill is ever going to actually occur. Again, the tribe's arguments here haven't been that the court should assume three minutes instead, and that makes a difference. That wasn't their comment. Their comment has been that the court should assume that it will take eight hours to shut the pipeline down. And then we're also talking about the small leaks. Right. So we've got one thing that this report sometimes seems to have gotten a little confused about is the detection and shutdown time for these small, let's call them pinhole leaks, and then the shorter detection time for a catastrophic rupture. There's no evidence in the record that shows that a catastrophic rupture where the pipeline is sheared right in half is going to take longer than one to three minutes to detect. But pinhole leaks, that can take a lot longer. We all agree about that. I mean, the court's response was, and you can find this, that there's a discussion of pinhole leaks in these issues, that Volume 8, Joint Appendix 2022 through 2025. I mean, the court concluded that the tribes had overestimated and overstated the risk of a pinhole leak, in part because this whole pipeline has been built to prevent them, um, because it's got double thick walls under Lake Oahu and special coatings. But we're doing a worst case discharge here. So the fact that there's a low chance of it happening doesn't seem to me relevant at the point of seeing what if things go wrong. The worst case discharge, Your Honor, is an analysis of the catastrophic guillotine break rupture, not of a pinhole leak. The court didn't assume, though, that a pinhole leak couldn't occur. It didn't assume that the pipeline has leak proof. But what it did, what it did was it modeled spills that are larger than the vast majority of pinhole leaks on the record. And the tribes have gone out and they found two... There's also arguments here about leak detection. And I'm just trying to, you know, I get that was raised as sort of a distinct issue. On the other hand, if you had, um, a pinhole leak that went on and on and on and on because it wasn't detected, then why isn't that something that should have been analyzed in the EA? All we got, all we got, unless you can tell me what else to have, is that, well, imbalance will develop over a period of time and will eventually be balanced. That doesn't feel like the type of controversy eliminating analysis that is at least convincing. Well, I think there's two issues. And I think probably you understand the first one, which is that you can't just take the longer time for the pinhole leak and plug it into the worst case discharge equation, because that assumes the whole pipeline should not, but you have to have a smaller flow rate out of the pipeline. And then just, look, if you don't want to put it under that category, put it under the leak detection flaws. Yeah. So focusing on leak detection. Yes, you're right. That volume eight joint appendix 2022 core explains that the pipeline systems, not the CPM system, not the pressure sensors necessarily, will eventually detect a pinhole leak. What system? So the pipeline has these, I believe it's called SCADA. The record was that those do not have a particularly reliable detection rate. Well, so there's the CPM system, which we all agree cannot reliably detect small pinhole leaks. And in fact, as the tribes recommended, we shouldn't be using it to try to find those leaks. We should be focusing on a rupture because we don't want a lot of false alarms coming out of that system. But the CPM system is a computer program that lays on top of the SCADA. The SCADA also monitors how much oil is moving through the pipeline, which becomes, as I understand it, a complex issue because the volume of oil depends on the pressure and fluid mechanics questions that are beyond my skills. And that's the system that, well, pipeline company needs to know how much oil is going into the pipeline and how much is coming out. And eventually those two numbers are not going to match. No, no. But so, I mean, at least in the record, there is the Sunoco had a 8,600 barrel spill of oil during a 12-day long slow leak in 2016 with the SCADA detection equipment showing a detectable mirror imbalance. And yet we had 12 days of slow leak that led to 8,600 barrels. Right. Yes. And so. That's a problem. Right. So. It would have been analyzed by the Corps. These leaks were eventually detected, which is what's the course conclusion. 12 days. 12 days. 600 barrels later. Right. But the Corps didn't assume that that kind of thing, the whole leak wouldn't happen. It's the first line. It analyzed spills larger than that magnitude. And it found that the spill of 50% larger magnitude than that 8,600 barrel spill would have high consequences, but they would be temporary and they would be limited. And then they concluded that the risks of these spills are very low. Now, the risk of that kind of spill is very low for this pipeline because it's specifically been built to prevent the kind of corrosion that causes those pinhole leaks. It's been tested. It was tested before. We're talking about leak detection here. Not whether it will happen, but if it does happen, will it be? It's a separate question. There's risk and there's consequences. Right. There's consequences. I don't know how, if the equipment doesn't work or doesn't work for a couple of weeks. And because this thing is so far underground, it's not going to be detected visually by anything. I mean, I think the only way you would detect it at that point, if the scan equipment isn't reliable, is when it eventually comes through either in water or comes up through the ground or aquifers into some other water or up to the surface. My understanding, Your Honor, is that it would likely travel up the borehole so it would come out where the pipelines enter the ground. I apologize. I think my reception wasn't real good for a second. Could you say that again? I missed a few of the first words. So, what I said was that my understanding, Your Honor, is that the oil would likely travel up the borehole of the pipeline so it would come out on the ground where the pipeline enters the ground. So, yes, exactly. So, the Corps acknowledged that this sort of leak detection would take longer and it analyzed spills of sizes comparable to the pinhole leak spills in the record. The tribe has only identified two pinhole leaks that were ultimately larger than the spills that the Corps analyzed. And in each of those cases, there are important distinctions. I mean, the pipelines either didn't have these electronic leak detection systems or they had it and they were ignored for whatever reason. And the operator here assures us that they've taken procedural steps to ensure that that doesn't happen on this pipeline. So, the Corps did look at these issues. There's no dispute. It's not controversial that a pinhole leak will take much longer to detect. And given the operator's history of leak issues, why don't the two of these, I know everyone wants to put things in boxes, but I'm trying to figure out why it all together doesn't, why those two don't intersect. So, the tribes didn't show that this operator has a significantly worse safety record than any other operator. It's reported more incidents, but it also operates more pipelines. So, if you look at the metrics by per mile, it's not clear that it has a significantly worse safety record. But I think that per mile analysis was a national one, right? You looked at sort of national averages. And they had statistics for the amount of leaks was significant. And then there was a discussion, a lot of it was on their property as opposed to underground. I'm not sure why that matters if they're having leaks. Right. So, I think you can find the operator's response to all this in Volume 7 of the Joint Penalty Report. I'm more interested in the Corps' response to it. Well, so with the Corps, I mean, the Corps reviewed those criticisms and responded to them. You can find that at Volume 8 of the Joint Appendix at 1953. So, the Corps did look at overall safety records for pipeline incidents, right? That was a core element of its analysis, which necessarily includes this operator along with all the others. No, I know, but if you had an airline that was crashing a couple times a year because of some equipment malfunctioning, no one would think it would be reasonable to say, well, when we average that in with all the airlines and all the other ones aren't crashing, that there's a perfectly fine record here. We don't have to pay attention to the fact that this airline is crashing twice a year. I think that's a fair point, Your Honor. I don't think the tribes made that showing that this is the airline that crashes all the time. I don't know what that means. Right. They didn't say that it was an airline that crashes. They said it's an operator that leaks a lot. Well, I don't think they made it. In any event, the Corps modeled oil spills that are larger than any spills reported for this operator. So, the Corps, again, did not assume that because this operator's safety record is so impeccable, this pipeline will never spill. It took a serious look at the consequences if there were not just a catastrophic spill, but smaller spills in the sort of 90th percentile range of reported oil spills. It weighed all that, and then it also independently the structure and safety systems of the pipeline. It looked at objective measures of this operator's safety record. You can find those. We have the citations in our briefs. Okay. Can I... I'm sorry for the tolerance of my colleagues here. I just had a couple... Sorry. Did you have a question, Judge Tatum? Yeah. I just want to follow up on your question, Judge Millett. You told Judge Millett that, and you say this, and the Corps says this, that the operators' spill per mile record are in line with industry standards. But let me ask you about the record on that. For the whole industry, the most recent data, which is for 2017, is 0.848 accidents per 1,000 miles. 0.848 accidents per 1,000 miles. That's at Appendix 1833. And for Sunoco in 2019, it was 1.42. So, where do I find an explanation by the Corps that those figures are comparable? Well, I don't think there's an explicit discussion of those figures in the Corps. Well, but you just told us that Sunoco's record is in line with industry standards. And here's two numbers that look pretty dramatically different to me. In fact, one's twice the other. And so, I'm asking where in the record does the Corps explain that those are, in fact, comparable numbers, that is, in line with industry standards? I mean, they could be. I just don't know. But to me, they look pretty dramatically different. To some degree, I'm going to have to defer to the Operators' Council on this, Your Honor, to defend their safety record. I can tell you that the Corps' discussion of this issue in Volume 8 of the Joint Appendix in 19- Wait, you're going to have to defer to whom? The Operators' Council to discuss further the nature of their safety record. Oh, okay. We have to know what's in the record that the Corps analyzed. I guess that they'll have their own arguments about that. But I'm not sure how that answers Judge Tittle's question, that someone else is going to tell you about their safety record. We need to know what the Corps determined about their safety record in this record and in this decision. The Corps did not make, as far as I'm aware, Your Honors, specific findings that said Sunoco's safety record is comparable to these national averages. I don't believe that finding's in the record. If that's a critical issue, I think the answer to that is not to compel the Preparation of Environmental Impact Statement, but to remand that question to the Corps so they can explain whether they did or didn't consider that and why it does or doesn't matter. So you're in the room with you now rather than the- Right, that's right. Yeah, I mean, I've given you the site for their whole discussion. I don't think they made that explicit finding. I don't- By the way, are you aware of a NEPA case where if there's defects in the EA, the Environmental Assessment, that suggests that an Environmental Impact Statement should be prepared that the court remands to the agency on that issue rather than simply requiring an EIS? I believe there are such cases, Your Honor, where it simply remands for further proceedings consistent with its order, which would allow the agency to make its own determination about, in light of the court's reasoning, whether or not it could make that convincing case for its own environmental impact or not. Okay. All right. Well, as Judge Sintel said, that's getting into the remedy. Judge Millett, did you have other questions? I just had a couple just procedural things. What is the current status of your Environmental Impact Statement? And do you have a timeline for finishing it? So the court has begun the process of preparing Environmental Impact Statement. It published a scoping notice on September 10th. It's extended the commentary for that to October 23rd. It held two virtual scoping public meetings on October 15th and 16th. The court had previously told the process to take about 13 months. The court yesterday updated the- Expected what? I'm sorry. You just broke up. How many months? I'm sorry. You just broke up on me. I'm sorry, Your Honor. How many months? About 13 months. About 13 months. But yesterday, the court warned the district court that it may take somewhat longer than that. What does somewhat longer mean? Did you just say somewhat longer than the district court, or were you more precise? Yes. No, we were more precise. We said somewhat longer. My understanding is that the pipeline operator has certain optimization proposals that are currently pending, and if those go through, the court has to consider how its analysis needs to change or not in light of those proposals. What's an optimization? Is that the doubling the capacity? Yes. They want to put more oil through the pipeline. So if they do that, the court may need to take more time to consider that and how it affects their analysis. Okay. And right now, the NEPA analysis, including the worst-case discharge, were premised on the current volume of oil, not on the doubled amount of oil that's expected to happen next year? I don't know if I would characterize it as expected to happen or not, Your Honor. They were based not on the doubling of oil. Pipeline has said publicly that it's expected to do it in the third quarter of 2020. The court doesn't regulate that, so I don't have any insight. All I'm asking you is your NEPA question. It does not analyze the amount of fuel going through this pipeline at all. It does not because that proposal wasn't on the table at the time they did the analysis. If that happens, if they want to implement this proposal, then the court is going to have to its NEPA analysis and what more, if anything, needs to be done to address that. They may have to sort of redo aspects of the NEPA analysis in light of the doubled volume. Yeah, I mean, that may very well be where they end up. And can I ask another thing? You know, there are these changes to the environmental assessment and also the EIS regulations recently, and the including elimination of a highly controversial factor for deciding whether you need an EIS. I found the language of when that new regulations apply to be rather vague. If we were to remand for the agency to decide whether an EA or EIS is needed, would the new regulation apply? Well, I have to confess, Your Honor, I don't know the answer to that question. I don't know that the court has taken a position on whether or not, I mean, if it's doing an EIS, my understanding is that that issue is irrelevant, right? Because it wouldn't be looking at highly controversial issues. You've said that one form of release that you think is appropriate here is a remand for you to decide to apply the law to decide whether the environmental impact study is needed or not, which means you would go through the relevant regulatory factors to decide whether it's needed. And if it turned out on remand, you picked up the new regulations, which textually, I'm not sure, they may apply or not. That's what I'm asking you. And you would go, thank you, D.C. Circuit, we've now eliminated the highly controversial factor, so nothing more for us to do. Your Honor, if you were to remand for further explanation, which is what I had proposed, then the new regulations would be irrelevant because we explained the decisions and analysis. No, no, if you wanted a remand, I'm talking about what you argued for your brief, and that is a remand for you to, based on, if we were, and this is all if any, we never happened at all, but if we were to decide there were areas of concern here, so that the existing environmental assessment was insufficient, vacated, and then what you want is a remand for you to decide whether a new environmental assessment can address the concerns raised by the court, hypothetically, if there were, or you decide that, no, we need to do an environmental impact statement. Now, I'm trying to understand why your next position wouldn't be under this new regulation that we don't have to address the highly controversial factors. I understand the question, Your Honor. We haven't taken a position on it yet. I mean, a court, I suppose, could prepare a new environmental assessment right now based on the new regulations. Right, right, so that is one thing that could, if we were to do what you want, and you don't want it at all, you want to cover your second option, and that is to remand for you to decide next step, you might just say, we don't have to deal with highly controversial anymore. Yeah, I understand the issue, Your Honor. I understand why you're concerned. And it's hard for you all, because you all don't interpret those regulations. And then, you were supposed to tell a district report to the district court, probably a couple of weeks ago, about what you're doing, whether you're pursuing any kind of enforcement action, because you have this fuel carrying pipeline still operating without an easement. Yes, Your Honor. And I guess if a few more weeks have passed, do you, can you tell us what the court's position is? You can find a long discussion, so this touches on the court's encroachment policies and regulations, you can find a long discussion of that, and I'll summarize it in a second, but at ECF number 562, the status report filed on August 31st, that explains in more detail than I will do right now, but the short answer is that the court is not pursuing, it's not referring an enforcement action to Department of Justice at this time, for example, to have the pipeline removed immediately, but it is continuing to encroachment policies as part of the revised EIS process. So, I think the court's goal is to reach a decision on whether to require removal or out-grant of such a new easement, to make that decision at the same time that completes any further, this further environmental analysis necessary to support that decision. Yes, the court's regulations contemplate how a grant would require an easement analysis. Thank you. Thank you very much for your help. We'll hear from Dakota Access, Mr. Estrada. Before we do that, Ann, should we try, could you try again to have Zoom switch me to a call, please? I am trying right now. Okay. I see that Zoom is calling you. Not here, they're not. Okay. Well, let's just proceed. Go ahead. I'll struggle along. Go ahead. Thank you, Judge Tatel. Thank you, Judge Tatel, and may I please report? Sorry about that. Not a problem, Your Honor. In June 2017, the district court largely agreed with the agency's that the risk of an oil spill was sufficiently low as not to require an EIS. The district court has consistently adhered to the conclusion that the risk of a major spill is low and has consistently said low, extremely low, or even minimal. The court did in June 2017 remand for what is characterized as further analysis on a discrete number of issues, which the Army Corps exhaustively concluded. After the court ruled in Semonite, the district court concluded that under the compulsion of Semonite, it was compelled to conclude that there were controversies that required a preparation of an EIS. We believe the district court was mistaken in that respect, but even if the district court were correct that Semonite requires either a further EA analysis on remand or an EIS, we believe the district court was clearly incorrect in vacating the easement under Allied Signal, given both the limited number of errors that the district court found and the undisputed disruptive consequences of vacating the easement. I'm sorry. Go ahead. No, no. Just before I go on, I would like to say just a few things about some of the questions, and maybe I will address some of the issues that have come up. Let me start with some of the issues that were raised by you, Judge Millett. This is, in the end, APA review, arbitrary and capricious. There is meaning to be given to the substantial controversy, high controversy, you know, requirement, which is only one of 10 that applies here, but ultimately is meaning that feeds into a process statute, the NEPA, and it doesn't add an additional substantive requirement to NEPA itself or to the EPA. Otherwise, we would have Vermont Yankee problems, and so I don't think that that's a productive way for the plaintiffs to go, because at the end of the road, the issue will remain whether the agency rationally answered the criticisms that were submitted, even if not in the precise form that the plaintiffs would have wished. This court said in Friends of Fresno Trail that the agency is not obligated to answer everything in detail. That's point one. Point two is that there is this failure to sort of take stock of the fact that in the remand, the plaintiffs submitted 339 objections, which the Army Corps exhaustively considered, and it is a little bit of Monday morning quarterbacking. It's not to be considered. It's not the same thing as reasonably answered or convincingly fits into our APA analysis. I know it's our case law, but I'm just having a little trouble figuring out how that factors in here. Well, I think ultimately, it has to be convincing to the rational mind that applies the arbitrary and the pressure standard. I don't think it is an enhanced standard above what the APA actually requires, but I think ultimately, the question is whether the issues that have been raised are sufficient to warrant the conclusion that the agency acted in a way that was arbitrary and capricious. We can take some of the issues that you have raised, say, for example, the worst case discharge. I think a fundamental misunderstanding in the plaintiff's position, which I think has been echoed in some of the back and forth this morning, is that just because the agency chose to examine it, there has to be some exhaustive inquiry as to whether they addressed everything that the plaintiffs would have wished. Actually, you first have to ask why the agency- Well, of course, it's not everything the plaintiffs would have wished. District Court didn't say that. There's no legal case about that. The question is whether they have raised substantial objections or substantiated, I should say, substantiated objections that need to be addressed in a way that is convincingly rational. That's not everything they wish. The government essentially admitted, at least on the history of the pipeline operator problems, some of the things that Judge Tatel flagged, they didn't really have much to say about that. Well, I do have something to say. You may have something to say about that. The question here is whether the court addressed that. No, I have something to say by reference to what the court said and what the plaintiffs failed to say. But let me finish, if I may, with the worst case scenario discharge. Keeping in mind firmly why the Army Court chose to examine this, I think it's helpful and indeed essential in figuring out whether the Army Court did enough. Because as we all know, NEPA does not require a worst case analysis. The reason why the Army Court was examining this is because there is a separate regulatory framework under PIMSA that does require this. And then you have to figure out what is the reason for that framework and what is it that it requires. The Army Court's job in this setting was to make sure that the job and the projections of the worst case discharge actually complied with our obligations under the separate statutory scheme. And the point of the separate statutory scheme is not to assume that every system will fail simultaneously and that an asteroid will hit the earth at the same time. I understand all that. That's the difference between worst case scenario and worst case discharge. I assume that's the worst case scenario. That's certainly relevant to that. If I could finish one last point, please, Judge Millett. It is to ensure that the operator has committed enough resources to meet whatever reasonably may be expected to happen that's really bad in human experience. Yes, but for NEPA analysis, it has to be what could happen environmentally here. Correct. Right. And even if they have lots of resources, they have lots of resources, we still have to, that sort of response time, that mitigates how bad things could be, but it doesn't change the required environmental analysis. Well, and two points. Number one, there's a requirement of a plan to answer it. And because, the plan keys off of something that conceivably could happen that is much worse someplace else in North Dakota, the resources that are allocated to dealing with a potential emergency are six times as large as anything that ever was calculated for this section of the pipeline. And so that any of these issues actually sort of pale in comparison, that is in the response plan. Sorry, I don't think I understand that. You're asking for this part of the pipeline? No. My point is that the point of the PIMSA ranks is to ensure that the operator will have contractors, assets, et cetera, to respond extremely quickly and to deal, to ameliorate anything that could happen that is really bad. And there are two plans that basically govern this pipeline, one South, one North. The Northern portion, which is in the it's a, you know, you can find it 1242, basically keys off a worst case discharge, which is not one that might occur at Lake Olahe, but it's one that might occur in a large storage tank elsewhere in North Dakota. And because that is conceivably, hypothetically so much worse, the resources that are available to deal with anything that might happen here under the PIMSA group plan are six times what the Army thought was the worst case that could happen at Lake Olahe, which was separately computed using the PIMSA formula. That's part of what I'm trying to convey. And so that in dealing with the record that the Army Corps had in front of it, not only was it dealing with the unlikelihood of the occurrence, but... You're saying that the tribe's concerns here were about how much we'd get out for poor remediation. So I'm not sure that that's responsive. Well, the second point is we're really sort of going through a lot of fly-specking with... Well, that's what you call it, and we call it deciding whether it's reasonable and... No, no, because... ...rather than an analysis. No, I think that's actually a fair description, because I will refer you to the remand analysis that the Corps did, and you can start at the appendix at page 1831 and go on for tens and tens of pages with the Corps examining many of the same objections that we have been discussing. With respect to leak... I just wanted to flag here is, am I right that the pipeline is planning to double capacity at least by the third quarter of next year? None of that is in the record, and I think that it's subject to... ...public record. Excuse me? Is it a matter of public record? Well, I think there are... It is in the record. We have... And so we are... You don't have a... ...making an application. You need a... Well, it's been vacated. ...capacity? Well... It's talked about on... It's talked about in the record by... God, it begins with an H. Donald Holmstrom talks about it. Yes, that is one of the plaintiff's experts, I believe, Your Honor. So, you know... My understanding is... Yes, I mean... ...you don't dispute... There's an expectation that there will be an application process. That will be part of what the agency will take into account in the regulatory process that is ongoing. Are you going to need a new easement for this additional doubled amount from the court? I don't believe so. If the judgment of the court is overturned, there may be separate regulatory approvals with respect to how the pipeline is operated. I guess I'm just confused. I thought... I must have missed it. I thought you said you don't have an easement yet for this doubled capacity. No... Were you trying to get a floor from somebody else? I'm sorry, Judge Millett. I'm trying to deal with the record we have on the appeal that we currently have from the decision on the review. The decision on the review vacated the easement for the pipeline that is existing. Oh, I see. That's what I meant. Okay. I'm sorry. Rather than deal with sort of events that may happen in the future, I was trying to come back to the action of the district court invocating the easement. Well, the district court itself said that this was one of the reasons they told the district court it may take a little bit longer. And... I understand. It's an application. And at least the fact that this was in the works is raised in this record. And it seems to be a matter of public record that the pipeline has announced that they needed clearance from a public agency, Illinois. That's all that they're waiting for. They got it and they're planning to do it next year. Well, I find all of this a curious inversion of Chenery, because we're talking about whether the court did its job. I'm just asking you questions about whether there's some fact that has happened in this case that changes, could make a whole decision sort of beside the point, because... No, I don't think... The analysis is going to have to be done, as I think Mr. Mason had said, based on the double capacity. I think we can... No, I think the short answer to your question is no, because the easement, whether it's granted or not, actually related to the construction of the pipeline, which is done, and either it was correct or not correct. Whether these other issues with respect to the expansion of the pipeline, I think ultimately would relate to the operation of the existing pipeline. It would be subject, of course, to regulatory control by other agencies, pension state agencies, et cetera. I don't think it's the issue that is... Let me clarify. So if we agree with you that the district court should not have vacated this easement, so your easement comes back, the existing easement, or the pre-existing easement comes back, it's unvacated, that nothing more would have to be done with that easement for purposes of doubling capacity, or the NEPA analysis... I'm sorry, nothing more would have to be done on a NEPA analysis for granting that easement. I don't believe so, and not only do I believe so, no categorical. I mean, the NEPA analysis is something that is conducted with respect to the infrastructure project that is contemplated. The project has been completed, the pipeline is existing, and has been functioning safely for three years. Yeah, but it seems like the NEPA analysis wasn't conducted with this capacity contemplated. That is... I think Mr. Mason had said they would definitely... He told the district court, if I understood him, and I'm sure he'll correct me if I'm wrong, told the district court that that's going to be something that will also address... Again, Judge Millett, that may be addressed if there is an ongoing EA on remand, or an EIS, as part of what the Army Corps already did here, which is to say, backstopping PIMSA in making sure that we have adequate contingency plans for dealing with things that could go wrong. I don't think it is inherently part of the regulatory job of the Army Corps to police how many barrels of oil go through a pipeline on a day-to-day basis. Of course, it's not a question of authorizing how much goes through in a generic sense, but whether that affects the environmental analysis. Do you agree that if we were to just remand for the agency to consider whatever concerns were raised, if any, and for itself to decide whether environmental assessment or environmental impact study is needed to resolve those issues, that the new regulations, the new NEPA regulations would kick in, and so the highly controversial factor would disappear? We don't believe so. I believe that based on the date of the publication of the notice to conduct an EIS, the agency would not have to apply the new regulations. Not clear at all to me from the language. When the EIS process begins, or the environmental assessment process begins, if things have been vacated and the agency starts over. Usually, but I don't have the language in front of me. I think there's a second sentence right after the effective date, which basically says that the agency can choose to basically continue with an already ongoing process under the old. Yes, and I believe that that's what the agency intends to do. Again, Judge Millett, our position here is that the agency did its job well in July 2016, that accepting that a remand was required, that the agency responded well and consistent with the law to all 339 comments made. And if I could go back to that question, and in response to the questions that you asked earlier, there were in fact responses and discussions with respect to the leak issues and the systems. As I said, it's extremely extensive. It goes on for tens of perhaps hundreds of pages, starting at 1831. I will refer you to pages 2022 specifically, and 2024 among others. I mean, there's a lot of discussion that is not sort of addressed in the district court's opinion. One of the things that the agency did, and I'm looking at 2024 just sort of randomly, is that a lot of what the tribes were saying with respect to pinhole leaks, for example, were positing a pipeline someplace, which might be sort of above the ground or in an area where nobody goes and only the cows see the little sprinkle. And things go by, and barrels and barrels are leaked. And the agency said, well, this is your paradigm, and those are the cases that you're citing from past experience. It has really nothing to do with a pipeline buried 92 feet under the water. And even if there were certain... I'm not sure why that helps. It just means it's even harder to detect. No. Again, this is expert judgment, not university engineering for my part. What the agency then said is, the compression from the ground would tend to limit that, and even if there were continued to leak, it would flow, given the horizontal drilling that was used, this is all on the page, to the other ends, and there would be something... I get that we can have the boreholes, but how long it takes to get there. Right. But given that... Again, as a matter of logic, Your Honor, given that the agency already estimated that the low probability and the spill mapping of guillotine breaks, the proposition that oil that could flow out of the boreholes as a result of... Are you talking about, did you say a guillotine break? Yes. I thought we were talking about a slow leak here. Right. And the point that was... Well, these are... In terms of the amount of oil spill, one is a lesser included, in the sense that if the agency already... No, no. Because the ability to think... If there's a guillotine break, the ability to figure out that something has gone wrong with your systems would seem to be much faster than a slow leak. That's my point. Well, right. But it is a position is... Purposes. One does not include the other. Different point. If the supposition, as the agency concluded, was that it would follow the path of least resistance to the boreholes, the detection may take longer. But as the agency pointed out, it will also be a lot less of the worst case discharge. And although it may take longer, given that the agency had already mapped spills in every which way, starting at page 1831, for an even larger spill, it was rational to conclude that this type of spill, given the path that the agency predicted for it, would not cause the significant harm that the plaintiffs are positing. In addition, the agency performed a separate analysis on the systems. And despite the criticisms of SCADA and CPM, it is not the case, as I think one of your honors posited earlier, that SCADA has a massive failure rate. If you look at the evidence that this report cited, what it is, is I think it's a PIMSA survey that pointed out... Survey from industry members as to how leaks were detected, which discloses that other systems in some circumstances detected leaks even faster. That is a failure rate. That's right. Those systems all, as I look at the record, seem to be people going by and seeing it, which is just not an option for something 93 feet underground. Again, I think that there is enough discussion by the agency with respect to the capacity of... If you can just help me on this. We're talking about a slow leak, so not the big rupture. We're talking about a slow leak, and we got some pretty critical language from the Corps about, well, eventually they'll find it at some point. For such a slow leak that starts 93 feet underground, so it's not going to be visually discernible until, I think they said some period of time in their language has gone by, is there any... And let's say it's a slow leak at the level that's below what the SCADA is going to detect. Is there any capacity, anything in the record that talks about how that will be detected before it's coming out of the boreholes? Yes, I believe... I mean, I have to go back to the detection from the... I mean, from the remand analysis. From the remand analysis, I have some other points here, but in fact, yes, I mean, there is the CPM and the SCADA systems will, in fact, detect a drop in pressure. You know, the record was within 45 minutes, even for a slow leak of that nature. There are some examples on the record that even some, like, two-barrel leaks while servicing some units weren't detected by these are painting. Otherwise, they would not be widely used and automated in all the industries, and people will have humans looking at these things everywhere. But to that point, I mean, there are also systems that require overlay of human inspections in all of these things, both by the company and by PIPSA, overflights, et cetera. Overflights, again, aren't going to detect something that's 93 feet underground. Well, yes, they will, if the assumption is consistent with the core's expertise that this will follow, you know, the path to the boreholes. Oh, right, right. So, the aerial detection will get it once it's coming out the boreholes, but it won't get anything before that. Again, I mean, when it's coming out the boreholes, somebody can see it, but... I don't really want to act like I'm a university engineer. I just want to sort of make clear that the core addressed these things in not only their expertise, but in what seems to be a perfectly commonsensical way to say that if you have tons of, you know, materials on a pinhole leak, this is unlikely to happen in the way that the plaintiff's model actually predicted in very different circumstances. That seems to me a perfectly rational way of addressing the reported controversy. Moreover, both in the EA and in the Riemann analysis, the core was very specific that in the majority of leaks of all types, a major factor is corrosion. And they have taken care to specify construction standards for this pipeline, and especially under Lake O'Avie, with enhanced corruption protection, so that the unlikelihood of this particular event is even higher, the unlikelihood. So, you know, the likelihood is low. Again... Can I ask you, unless my colleagues want to jump in, I will definitely be quiet. But the reason I had flagged early on when you mentioned allied signal, that analysis, and your talk about the economic consequences, which I think the district court agreed would be what are we to do with the fact that, as it turns out, vacating the easement didn't do any of that? Because it's allowed to continue to operate. I'm just trying to figure out, it seems like you use it for arguing that, and then it doesn't happen. It seems very strong, makes sense when you're arguing, but as it turns out, your position is that vacating the easement doesn't make you stop pumping the oil. Oh, but I think there what vacating the easement does is deprive us of a property right that had been granted that gave us the right to have not only the pipe under the ground, but to move the oil through it. And I think you are correct that for the moment, the government is studying its options under the encroachment rules, but we have no legal right to remain there where there are its sufferance for the moment. And so it seems to me that it is perfectly appropriate for our court considering vacating our property rights to consider all of these untoward consequences, which are considered serious and, in fact, enormous, because the court may not assume that the person who's the victim of the trespass will continue to suffer the trespass. What your present position is, you can continue to have oil flowing despite the district court's order, is that? I'm sorry, I did not hear the first part of your question. Is it your present position that you can still have flow through the pipeline despite the district court's order? Yes, because the injunction aspect of the court ordering us to stop was by this court, and the government has not ordered us to stop. The government has asked us to agree while they study the question as to what to do to continue to adhere to the easement questions that were imposed as part of the easement grant originally. One of the ironies of the vacator that was imposed by the district court that's been indicating the easement, the court also vacates all of the safety conditions that the Army Corps imposed for the benefit of everybody who's around, including the tribes. The only concrete action that the government has taken while it studies these questions is to say that we are required to agree, which we have, to continue to adhere to the conditions imposed by the Army Corps as a condition of the easement so that we can continue to use it. Okay, you've got my question. Okay, and to the point, you know, can you be able to double the capacity? Well, if the government sort of said as a matter of prosecutorial discretion, we're not going to do anything about this. Could you, consistent with the district court's vacature of the easement, double the capacity on the pipeline? Well, I mean, again, as I said earlier in response to your question, I mean, we have an appeal pending of both the underlying order that the Army Corps did not comply with NEPA and of the vacator. I'm aware of that, I'm just asking you a question, given what's going on with the district courts in response to the district court's vacature decision, and at least thus far the government maybe perfectly sensibly has said, you know, we're trying to figure out what to do, and if they said hypothetically, as a matter of prosecutorial discretion, we're not going to stop this, maybe even for some of the injury reasons that you've raised. Would you agree that at least you couldn't go beyond the status quo on capacity? Well, Your Honor, I think that would depend both on the consent of the government as the party who's suffering, you know, the encroachment, and on whether other regulators actually regulate pipeline safety. The others have authorized the increased capacity. I'm just trying to figure out, is there a sense in which the vacature at least sort of keeps things at status quo, even though it's part of the government's decision as to what to do? I mean, I think this is a version of the question that you asked earlier, Your Honor. I actually don't think the easement has anything to do with the capacity that goes through the pipeline. That is a question of regulatory activity that is committed to other agencies. Correct. So, if there wasn't going to be easement, then there wouldn't be any reason not to double the capacity. Well, subject to the concurrence of agencies, well, actually, it is. The government has to agree, obviously, but... Well, I mean, not only that, I mean, you know, the Army Corps does not regulate pipeline safety in this country, Your Honor. PHMSA does, other agencies do. Other agencies may be involved. I'm not asking that at all. I'm just sort of asking on whether there's a sense of status quo or not, but it seems like you've answered it. Well, I mean, yeah. I'm sorry, were you done with that line of questioning? Yes. Yeah, okay. Mr. Estrada, I have just a question or two about the vacature here. You say in your brief that we should not vacate the easement because the Corps is likely to be able to justify its approval of the easement, right? That's your argument. So, we shouldn't, correct? That is correct. Question before us, the Corps' decision not to prepare an environmental impact statement. That's the question. Well, no. What's the easement got to do with? What is the easement? Why does the likelihood, whether the Corps can likely justify the easement? What has that got to do with the environmental impact statement? Well, there are two antecedent questions that answer your question, Judge Tato. I mean, NEPA is a procedural statute en route to approving something else. It is usually not by itself something that produces an appealable event under BENDA and other cases, right? And so, vacating an EIS or an EA doesn't have any legal significance and it's not what the court, what the district court did here. What the district court did here was to vacate the easement based on perceived failings in the EA and the remand analysis. So, the question under Allied Signal and its progeny is whether the, whether the agency can justify the action that is being vacated, which is the easement, not the... I'm not sure that, I'm not sure that's right. I mean, suppose, take a different kind of case. Suppose there was an argument in a regular administrative case that the agency had failed to go through notice and comment as part of the rulemaking. And that was the issue before us. We wouldn't ask, in fashioning a remedy, that is, in considering whether to order the agency to do notice and comment rulemaking, we wouldn't say, well, we don't need to because we think the agency can ultimately justify the regulation. It seems to me this is exactly the same. Well, no, it isn't because, you know, a regulation, a rulemaking regulation, the issuance of a regulation is, is a appealable event that can be taken to this court on the basis of a failure to comply with the APA notice and comment requirements. But one of the first answers I gave you is that the issuance of an EA is a preliminary step with respect to the approval of something else. The issuance of an EA is not itself finally just the let me, let me put it this way. The requirement to produce an EIS is a step the statute requires to the ultimate decision about whether to grant the license. So how can you say that? Yeah, so how can you, how can we make it, I mean, even if you're right, that we look at the ultimate question of the agency's ability to grant the easement, the EIS is a critical part of that process. And I don't, well, I guess I don't see how they're related to each other. The question is simply, to me the question is this. It seems to me the question is this. Is the, if we conclude that the, if we conclude that the district court is correct, that the EIA is defective and that an EIS is required, doesn't that essentially require the vacator, vacation, the vacature of the easement until the EIS is done? I don't believe so. And I think as we pointed out in our, you know, reply brief, the plaintiff's submission, that NEPA has some sort of a special rule whereby compliance automatically needs to vacate or is denied by a long string of cases that are cited in Kutna III of our reply brief. More generally, I think the Allied Signal inquiry always, always comes up in the context in which the court has already found that something went awry. And, you know, the question then becomes how likely is it that the agency is going to be able to fix this and how harmful would it be to vacate this action in the interim? Now, I don't, I don't understand how we can make the judgment. Even if you're right, I don't understand how we can make the judgment about how likely it is that the agency will be able to lawfully grant the easement unless we have, unless the EIS has been produced. Well, you can. The question to that is if an EIS is required. I agree with you. If we didn't think that, then you would be right. But if we think, as the district court did, that an EIS is required, then I don't see how we can evaluate whether it's likely that the easement is proper without having the EIS prepared. Otherwise, why does, otherwise, why does NEPA require an EIS? Well, we don't think that it is. Let me just ask you. If I could answer the question, Your Honor. Go ahead. I mean, it does seem to me that in all Allied Signal cases, there is potentially a question of prejudging what the agency will do and things that should have been done that work. But that's inherent in the first question of Allied Signal. Nonetheless, the first question requires an assessment of how serious the failings were. In this case, you have a long series of opinions by the district court itself that concluded in June 2017, for example, that nothing prior to the EA, this is at 835, gave rise to any controversy, that the court largely complied with NEPA, and that rejected the bulk of objections that are usually raised in cases like this, including to the siting of the pipeline and to other alternatives. And so I think based on the work already done by the district court, you can be reasonably confident that this is a case in which the failings identified can easily be fixed. Okay. Let me just, one last, one last, sorry, go ahead. Go ahead, go ahead. No, you go ahead. Was it related to my line of questioning? Yeah, I'll hear you out, yes. Go ahead. No, you go ahead. I'd rather hear your voice. I have a very technical question. Go ahead. Not just Mr. Stratton, a very technical question. Do you have an answer to the question I asked counsel for the court about Sunoco's spill per mile data, whether or not it's in line with industry standards? He said you could answer that question for me. Yeah, you know, my first answer is that you're asking a question that they never raised in the remand, the figure that you raised. No, I'm not. No, I'm not. The brief says that, the court says that, the court says that Sunoco's spill per mile record is in line with industry standards, right? He said it in the brief, and I think you do in your brief, correct? I am, I am actually answering the 1.42 question that you asked, Your Honor. That, that was an assertion that was raised in the remedy briefing, but not as part of the remand. With respect to the, to the larger question, you know, the, the, the court did examine it, and I have the brief just now here, and I think I've lost it. The objections to Sunoco, and what it basically said, it looked at the post from, you know, the corporation, and it answered that a lot of the incidents that were being proffered, because it was based on, you know, reported incidents that don't distinguish venue or gravity, that a lot of the incidents being used were ones that occurred on the property of the operator itself. Now, you may recall that, that you got a declaration from PIMSA in the stay application, in this case itself, that described what has happened in this pipeline, including the incidents in this pipeline, and identified a handful of incidents in this pipeline, where the operators' property were 0.4 barrels, and things of that nature. And as, as the Army Corps went to point out, these sorts of things have some potential to damage some people, but are not, you know, the type of thing that are serious enough to give rise to a serious controversy. The, the Army Corps then went on to conclude that they were not serious enough. Judge Stenthill, did you have a question? No, that's okay. I'm, I'm, I am. Okay. Judge, we'll let you have any further questions. Just one more quick one. Even if the district court were to be reversed, as you argue, there were a couple of other factors that were not yet addressed by the district court, including the treaty rights, and environmental justice. Yes. So, we just have to go back for notes, if we'll be. To finish with the citation to Judge Tatel, that's at page 1953 and 54 of the appendix, Judge Tatel, what I was just discussing, 1953 and 54. And yes, Judge Millett, I understand that plaintiffs believe they have other issues that are unaddressed, and the district court put them to the side. I believe in the ordinary course, as happens everywhere, any non-forfeited issue that remains to be addressed after the district court errors are corrected, are open to the plaintiffs and remand, and we're happy to take them on their own terms, and to brief them on their own merits. We're still not, we're still not at the end of this process. Well, no, but. I'm not quite understanding you, Judge Millett. I was just saying, we're not, there's still more rounds of analysis of the environmental assessment, and the district court left a couple other factors unaddressed. You know, I think the first statement is that the plaintiffs believe they have other arguments that the district court has not yet addressed, and I think those are, can be raised on remand. Thank you, Your Honor. Okay, Mr. Estrada, thank you. We'll hear from the tribes. Mr. Hanselman. Yes, thank you, Your Honor. Good morning, and may it please the court. I'd like to focus my time on the two big issues before the court. First, the merits issues of whether the court's failure to prepare an EIS was arbitrary and capricious. And second, I do really want to reach some of these issues around vacature, and the fact that the pipeline is still operating despite vacature. There are some really important questions that we haven't reached yet, that I hope to get to. But let me start with the need for an EIS. My colleague, Mr. Masonette, has characterized the district court's decision as giving tribes a heckler's detail. And that characterization really denigrates district court's careful analysis, and it disrespects the tribe's sovereign role. The tribes have the responsibility to safeguard their communities in response to disasters, and they have agencies and staff with expertise that needs to be considered. The concerns identified by the district court were substantive, weighty issues. It wasn't flyspecking.  Explained that the court was relying too heavily on leak detection systems that weren't as effective as claimed. Explained that this company had an unusually troubled safety record that was never taken into consideration. Documented how- When we're reviewing what the district court reviewed, that is to say the review of the agency's decision, what do you say is the standard of review? Mr. Estrada and Mr. Masonette say it's the usual APA standard of review. Are you saying that there is an enhanced standard of review for the decision not to require an EIS? No, Your Honor, we're not- Not a highly controversial application? No, we are not contending there's an enhanced standard of review. The court's discussion of the convincing case, I think, is a gloss on your standard motor vehicle test, but it does acknowledge that the Army Corps needs to grapple with the issues and explain its conclusion in light of the facts of the record, which is what the district court found that the Army Corps didn't do. It wasn't just the tribes that were raising these concerns. In the previous administration, the solicitor of the Department of Interior echoed many of our concerns, urged denial of the easement and preparation of the EIS, and again, prior to the change of administration, the Corps started an EIS that would focus on these very issues. So in our view, the case here for an EIS is even stronger than the one presented in the previous case, because it's a technical critique of their insignificance decision. Both involve federal agencies as well as other entities with expertise raising these disputes, and both involve a change in administration positions that weighed in favor of a finding of controversy. The difference here is that the district court gave the Army Corps an opportunity to get it right. It gave the Corps a remand and a roadmap on how to come into compliance, and the agency was not able to justify its conclusion. So the focus of the argument has been on the probability of a catastrophic spill being low, and just a point on terminology. When we talk about risk... But isn't it correct that assessing the viability of an objection does involve looking at the risk as well as the consequences, the calculus of the two? Absolutely, Your Honor. When we talk about risk, that concept encompasses both the probability as well as the consequences. Both of those matters are... The agency needs to reach a rational, coherent explanation as to both of those issues, and both of them are on the table. So the fact that the probability of an event is low doesn't exempt an action from NEPA. No, but it does affect the reasonableness of requiring an EIS, does it not? If the risk is extremely low, then that would be a different calculus as to whether an EIS is required than it would be if the risks were simply low. Right. Significance is a feature of both the probability as well as the consequences. What we've been talking about here this morning in our discussions of whether the safety record is any better or any worse than anybody else's is a recognition that oil spills are not remote and speculative. They're completely foreseeable events that the agency needs to deal with, and they have to explain why their key conclusions about the potential probability and effects are not highly controversial in light of the evidence in the record. And on issue after issue, the district court found that the Army Corps couldn't do that. They failed that test. There was extensive and detailed evidence that effects were more significant, more disputed, more controversial than the Corps ever acknowledged. I think it's important to ground ourselves in the statute and that an EIS is required if an action is going to have significant effects. And in fact, this court has emphasized that an EIS is required if an action might have significant effects. Whether or not that threshold has been crossed is a binary question. If there are significant effects, an EIS is required. You can't avoid an EIS by adding more pages to an EA. You can't avoid an EIS by considering an issue. This is a massive piece of crude oil infrastructure operated by a troubled agency that was routed literally yards upstream of an Indian reservation. The whole point of the statute... I'm sorry. I'm just trying to ground ourselves in the fact that this is a massive piece of crude oil infrastructure. It's operated by a troubled agency, a troubled company. What is with this? I think we're only talking about the quarter mile or so that's under Lake Oahe, right? No, that's not quite right. The federal easement on either side of Lake Oahe is the trigger for Army Corps Review. Under NEPA, an agency needs to look at all of the indirect and direct effects. So anywhere where an oil spill along that pipeline could affect the lake needs to be part of the NEPA review. And in fact, that's what the review showed. Even an oil spill that was physically distant from the easement itself in one of the shallow buried parts could reach the river. That wasn't part of the remand analysis at all, was it? That wasn't part of the remand analysis at all. You are difficult to understand, Judge Millett. I have to, I mean, sir, in interrupting you, but it is hard to understand you. I'm not sure. My question? What's the problem? Are others having trouble understanding? You're not. You are, Ashley. One hand raised, yes. But I thought it was my system, so. No, it's not in your system. It's Judge Millett's. I had the same problem on my end in another argument that people couldn't understand me. Are you using the mic? I sure am. Yeah, okay. I heard your question, Judge Millett. I do think these issues were before the Corps on remand. One of the, Linda. Just to be clear, in case Judge Sontag didn't hear, my question is on one of the issues flagged on remand was not, as I understood it, whether there was sufficient analysis of spill or leaks, not under Lake Oahe, but on ground nearby where the oil could, I guess, run into Lake Oahe. I didn't understand that when she was before us. I think it was, Your Honor, in the 2017 summary judgment decision, when the courts found that the Army Corps had failed to grapple with the highly controversial factor for the first time, the expert input that was being cited all related to the risk or the probability and the consequences of a spill. The issue of however a oil could find its way into the lake was certainly part of that analysis. It was part of the company's analysis that they provided to the Corps as part of the remand. So, I think it's on the table. Unless there are additional questions about the merits, I do want to turn to this question of the remedy. We did want to ask you about your argument about winter conditions. Of course, it is. It's cold a lot. It's very cold a lot in North Dakota. And they acknowledged that icy conditions could obviously make it much more difficult to clean up oil and keep it trapped under there. It might dissolve into the water. But beyond that, there's really no other way to model out what the impact is. What is your argument or tribe's complaint about that aspect of their analysis? There is a way to do remodeling and they should have done it? I think what the winter conditions issue highlights. Now, again, the question of winter affects both axes of the risk spectrum. It increases the likelihood of a spill because you could lose power and the valves could not operate properly. It also affects the consequences of a spill because when the river is frozen half the year, it's that much colder. The Corps addressed whether the valves will work. And it said there's the temperature. The oil is maintained, I think it says 60 degrees, so even if it's cold outside, the pipe itself and the valves will not be at minus 10 degrees or anything that will impair their ability to operate. I think that the primary question around the valves, Your Honor, was the lack of backup power. So there's no remote way of shutting off the valves in winter conditions. If there is a loss of power, the valves stay open. And the record showed that that alone would triple the size of the worst case discharge. But I think what the winter conditions and that gets at is it highlights the significance of the potential impact. The agency can't avoid an EIS by acknowledging, yeah, a winter spill would be a catastrophe. We wouldn't be able to clean it up. It highlights that, in fact, there is a significant impact here. The probabilities are greater and the consequences are greater. And that calls for an EIS. MR. WILKERSON You started into the remedy, I think, a moment ago. On the injunctive element of it, state the second part of the Allied Signal Test, please. MR. WILKERSON The second part of the Allied Signal Test looks at the disruptive consequences of vacature. MR. WILKERSON Say it again, please. MR. WILKERSON The second part of the Allied Signal Test looks at the disruptive consequences of vacature. MR. WILKERSON If, as I had once understood, the current situation is that the flow is being interrupted, would that not be a significant consequence of the disruptive consequence of the court's order of the vacature? MR. WILKERSON Well, this gets to Judge Millett's question, is what is the effect of vacature? MR. WILKERSON That's what I'm wondering about right now. But before we get to that, if that's the consequence, would that not be a disruptive effect? MR. WILKERSON We don't deny that. This is a significant piece of infrastructure that would be an impact on the company. But as this court recognized in Semonite, these kinds of decisions are within the special expertise of the district court to assess. And the district court did not act hastily. It held another round of briefing, again for a second time, in which the company, Amakai, and others all weighed in. We offered our own explanation why failing the vacate would be disruptive. This court reviews that decision under an abuse of discretion standard. And there's no question that the district court weighed all of the impacts, and it acknowledged that there would be disruptive impacts of shutting down the pipeline. But it did find that those were outweighed by other factors. MR. HESSELMANN Thank you. MR. WILKERSON Mr. Hesselmann, I want to ask you about the shutdown order. The district courts were shut down in the operation of the pipeline. So in our August 5th order, we said that the district court didn't make the findings necessary for an injunctive ruling. Now, my understanding of the record is those findings still haven't been made, correct? MR. HESSELMANN Correct. The district court has not moved on that.  WILKERSON So then why isn't the August 5th order just law of the case on the shutdown question? MR. HESSELMANN Well – MR. WILKERSON In other words, we've resolved that issue. It's over. Until the district court makes the findings one way or another, that issue's over, at least for purposes of disappeal. MR. HESSELMANN Your Honor, I understand – MR. WILKERSON That's August 5th order, isn't it? MR. HESSELMANN Your Honor, I understood that order to be on an emergency motion for stay, and that there was a likelihood of prevailing for the government on that question. We are asking – MR. WILKERSON That's not what it says. Parts of the order do talk about likely success on merits, but this part of it says, quote, the district court did not make the findings necessary for injunctive relief. It didn't say that the court was likely to succeed on its argument that they failed. It just says flat out they didn't do it. The district court didn't do it. It seems to me that that's law of the case for us. MR. HESSELMANN Your Honor, there's an important question before this court right now, which is, was an injunction required to shut down the pipeline? The question of whether the court made the findings is a distinct question. MR. WILKERSON What if order resolves that question?  HESSELMANN Well, Your Honor, we're asking this court to reconsider, because there are some very MR. WILKERSON We can't. We can't do that. In this circuit, orders of special panels are binding. We've held very clearly that later panels can't depart from decisions of the solutions panel. The motions panel did not answer the question of whether an injunction is required, and what is the effective vacature?  WILKERSON Well, why would it have said the district court didn't make the findings necessary for an injunction if it didn't think that an injunction was required? In fact, it's pretty clear from the record in that case that the district court actually didn't think it was entering an injunction, because it didn't make the findings and was saying that it had to. HESSELMANN Well, there's still the question of what is the meaning of vacature? And right now, because of that order, vacature means nothing. It means that the pipeline can continue operating, and it means that MR. WILKERSON I think you made that argument before the special panel also. Same argument. HESSELMANN Okay. I mean, I don't know what to tell you. We think that there is a major unanswered question, but it hasn't been resolved. And so I hope to at least have the opportunity to take my best shot at why vacature actually  MR. WILKERSON Well, go ahead. You still have some time left. You can argue the case any way you want. Go ahead. HESSELMANN All right. Now, so the question is what does vacature mean? And under the Army Corps' interpretation here, vacature doesn't mean anything at all except that it has the discretion to decide what to do about the violation. If that was the standard, it would eviscerate this court's jurisprudence. Literally every vacature case that this court has looked at would have been looked at differently if that was the standard. The entire point of looking at the  WILKERSON It's different. I think a lot of our cases have involved permits or other forms of authorization for the actual activity that were legally required. This is an unusual case in which what we're dealing with is an easement. And once an easement is gone, the government, you know, that's a permission to go across government property. When the easement is gone, you simply have the situation of someone who is on their land without authority. It's not that they lack legal authority to do it. There's not a permit or license here that's issued by a regulatory agency. It's just, you know, will we keep trespassing or not? What's the government going to do about that? It just seems like this is a different scenario than permit or licensing cases, which I think is what the cases you sent involved. I think the notion that because this is an easement, it's different in kind than a regulatory permit is completely unfounded. If you look at the Mineral Leasing Act, which governs the easement here, 30 U.S.C. 185, subsection F and G of the statute explicitly require the agency to regulate the operation of the pipeline to insurance savings. Subsection H calls for an operations plan and scrutiny of how operations can impact the environment and fish and wildlife and people like my clients who rely on fish and wildlife for subsistence purposes. The Corps' regulatory authority over the project is reflected in the easement itself, which is at A648. But the Corps did not authorize the movement of oil through the pipeline. That was best done by someone else. What the Corps authorized was an easement for a pipeline specifical structure to the oil property. But the authority to move the oil through that, starting from North Dakota and going all the way all the way, was also set in the statute, was it not? No, Your Honor. The easement regulates the operation of the pipeline. It says it discusses pipeline operations in multiple places, and it specifically holds the pipeline operator. Your Honor, that's not what the easement says. It regulates the operation of the pipeline. It calls for a plan of operations. It specifically calls for approval of any change. They are regulating the operation of the pipeline underneath Lake Elahi. I don't think the regulation extends to where it crosses Mississippi. That's a different permit. But I also wanted to emphasize this isn't the only permit at issue here. There are two other permits under the Federal Clean Water Act and under the Rivers and Harbors Act. The Rivers and Harbors Act permits… But other agencies permit. And other agencies permit district courts for purposes of a remedy decision. Correct? That's true, but it highlights the fact that the Corps is operating in a regulatory capacity, and there's nothing… Other agencies are operating. Those are permits issued by the Corps. All right, but there's a different standard. There's no finding of a mutual violation in the Clean Water Act. Well, there is, because we challenged the Rivers and Harbors Act permit. I just want to give you a citation so that you have it. You can find that at… Well, you may have challenged it, but that's not before now. Well, okay, but… This is a general attack, as I understand it. This aspect of the… I know there's been rounds and rounds, but this aspect of the litigation before us is a general attack on the Corps' decisions writ large. It is, in your own formulation, an attack on the easement under Nagohe. I'm sorry. I'm having a… I am having a hard time hearing you. You're very… You're very muffled. That's okay. The Army Corps is trying to frame this as an exercise of enforcement discretion, but that isn't the right framework, for your honors. Here, the Army Corps is the wrongdoer. They're the ones that violated the law. The agency doesn't get to decide the remedy for itself when it violates NEPA. Now, they've talked about this encroachment policy, but the encroachment policy addresses a fundamentally different situation. Now, when a third party trespasses on federal land, it makes sense that there is a process to sort out the property boundaries and figure out how to either get them permitted, but that isn't what happened here. It's the Army Corps that violated NEPA, and the permit that it granted was vacated. It's the court's prerogative to define the remedy, not the agency that violated the law. The outcome that they are promoting here is specifically precluded by Monsanto. That case also involved questions of remedy for an agency that violated NEPA by failing to return EIS. The court vacated the authorization and enjoined future authorizations as well as any private planting until an EIS was finalized. The court left the vacature in place. No one even challenged that, but overturned the injunction, and one of the reasons it gave for overturning the injunction, this is at page 165, is that vacature alone would prevent the activity authorized from proceeding. There was no need for a separate injunction because vacature would prevent the action from going forward. We're in the same position. There's no need for an injunction because the pipeline can't operate without an easement. If my colleagues are done on the remedy issue, can I ask you to back up and ask you one thing on the merits? And that is, in the worst case, it discharged. My understanding of your argument was that it would take hours or days for a, I guess this is what we're calling, a VAT break, a VAT rupture, to be detected, rather than, as the court said, within 9 to 12 minutes. What substantial scientific basis do you have for hours or days for a VAT rupture to be identified? Yeah, on that issue, on the worst case discharge, the question is whether there was a, I think the question for this court is whether there was a substantial controversy around whether they estimated a worst case spill correctly. A significant component of that was time to detect the spill. What the district court found was that the Hoare's estimate included literally zero time, and we got into a discussion about whether there was a minute included or not. But the evidence that we had provided to the agency showed is that in the real world, these spills are very hard to detect. The Talamazoo spill, which was probably the worst pipeline disaster in modern times, that gushed for 17 hours. And as we saw, the court dismissed that example of, well, there was a mistake in the control room. Well, that was exactly our point. Mistakes happen. People, there's human error. Systems fail. And they built a system around everything working perfectly. I don't think the question was, you know, that it would take eight hours to detect the spill or whatever it is. The Army Corps has to justify its finding that there was either zero detection time or one minute of detection time. And what the district court found was the record didn't support that finding. But there's not the point, if you're talking about the difference between one to three minutes versus days or hours, that's pretty material. I'm just trying to find out why it would take, for the worst case, a discharge, which is not everything going wrong that could go wrong in the world. But for the worst case discharge, that would be hours or days. And if we get to the point of start, I'm trying, I just don't know quite how this analysis works, because if we get to the point of assuming nobody does their job properly, nothing is ever going to pass underneath them, because we assume everybody is asleep at the wheel. At every stage of the operation, everything's going to be incredibly severe impact. So that can't be what the worst case discharge analysis requires, can it? No, no, I think that my colleagues have posited a straw man, where the worst case is infinity. And the burden on the agency is to rationally explain why the potential consequences of a spill don't reach that level of significance. I don't know, but they have said, they want a more cabin analysis of what this worst case discharge is. And it's not everybody asleep at the wheel. It really is, you know, looking, what's in the pipeline in the relevant area? And if it all came out, how much time before it will be stopped? The reason will be expected to be stopped. Not whether you can conceive of a situation that wouldn't get stopped, but whether there's a reason to be expected to be stopped. Why is that not the proper analysis? What if somebody hasn't, that's not the proper analysis? And instead, you know, the precaution of undertaking is, if I conceive of a situation in which it would take longer to stop. Your Honor, the agency has to grapple with the facts in the record before them. There was evidence, abundant evidence, that spills take a lot longer to detect. There was abundant record evidence, undisputed evidence, that if the valves failed, the size of the spill would triple. They need to coherently explain. What is the evidence that the valves would fail? The reason will be expected to fail. That there was, that there is no backup power in this extremely remote part of the country, and they were relying on manual closure, whereas the pipeline would drain empty of tens of thousands of barrels of oil before anybody could reasonably get out there. So they've got to grapple with these issues and reach an explanation. Why there's no controversy around the size of their spill. It's not assuming that everything that could go wrong would go wrong. You've got to pick a number that reflects the input in the record. Thank you. Okay, any other questions? No. Okay, thank you. Um, let's see. I think both counsel, Mr. Mason and Mr. Estrada, you were both out of time. You can each take one minute, if you would like it. You're on. So I just had a few points. I wanted to let you know that the Corps has decided to do the EIS that it's working on right now under the old regulations. Just wanted to let the Corps know that. Second, Judge Taylor, you asked me whether or not I had a case where... Can I just clarify that? But that's the order of EIS. But if instead, this court were to hold as you requested, that we're just remanding to the Corps to decide whether EIS is needed, have you also agreed that you would apply the old regulations to that decision? No, I mean, the Corps hasn't made a decision about that. That's the only one. That's the relevant one here. Yeah, I just wanted to clarify that one point. Just so you asked for cases where EA had been found defective, but then no EIS had been ordered, I can give you two. Grand Canyon Trust v. FAA, that's 290, F339, and 347 is the pin site. And American Rivers v. FERC, which is 895, F332, at 55 is the pin site. Those are both D.C. Circuit cases. I'm sorry, Your Honor, I didn't quite understand. Did either of those involve a third vital sample? No, probably not, Your Honor. Not that I'm aware of. Mr. Hoffman has argued that the valves could fail. But again, this is the kind of example of worst-case scenario thinking, because what we have to happen for his tripling of the size of the worst-case discharges, there has to be a guillotine break in the pipeline that happens during the winter, and then also the valves fail. And then they can't get to it in time. So you have to assume a whole series of worst-case scenarios to get to that tripling spot. Does the EA do anything about a remote ability to correct that valve fault? The valves are remotely operated, Your Honor. What Mr. Hoffman is suggesting is that the motor systems for the valves could fail. And if that happens, the valves can be manually actuated, but somebody's got to walk out there and do that. I don't have, I don't know the estimate for that, Your Honor. I think what Mr. Hoffman is suggesting is that in the worst winters, you know, in a North Dakota winter, it could take longer than even core estimated. North Dakota winters are pretty bad. Yeah, no one disputes that. That's not a highly controversial matter. And finally, Your Honor, Mr. Hoffman said that he had, abundant evidence that these spills can take a lot longer to detect. Again, we agree that small leaks can take a lot longer to detect. It's the catastrophic ruptures of the course that wouldn't take a long time. And the example that I give is this Enbridge-Kalamazoo spill, where the alarms were ignored. That's one example. We have a whole historical record of examples. That's the most extreme that operators assure us they've adopted new procedures. All right. Thank you, Your Honor. Mr. Estrada? Thank you, Your Honor. Just let me make a couple of quick points. Starting with the back. To this day, you know, Mr. Hasselman still has not cited a single case in which the court has shut down a major infrastructure project in the face of conceded massive economic and environmental harms, where the district court has found that the railroad agency largely complied with the relevant statute, NEPA. And in addition, you know, the relevant risk has repeatedly been found to be low or minimal. That's point one. Number two, I think it is conceded under this portion of the decision in New York, that probability affects significance. And thus the potential need for an EIS. I don't think that that was something that was considered in any, you know, respect in Judge Boothworth's opinion, even though we repeatedly briefed it in the summary judgment briefing. Number three, there is this notion that the last administration, you know, demanded an EIS. That is, in fact, not so. The Army Corps repeatedly stuck with this view that a EA was sufficient. And even in December 4th, when Deputy Secretary Darcy concluded on December 4th, 2016, that one might be prepared, she reaffirmed that the actions of the Corps comported with the law. The district court itself, in this case, expressly concluded in 835, that there was no controversy with respect to anything that happened before the issuance of the EA. And so we're really looking at the remand point. Last point, Judge Dina Millet, we don't think this case is semonite at all because we are, in fact, dealing not with expert agencies who are committed with the trust of looking after these resources, but with the quintessential, as the court put it, not in my backyard neighbors. But in any event, if you conclude that it has a bearing on these issues, even though even the tribes themselves don't believe so in their brief, it would not be a third bite at the apple because it was issued after the briefing. Will we have treated tribal government as the same as complaining private individuals? When tribal governments are sovereign. I don't have any dispute whatsoever. Different issues. And they have rights to be adjudicated when they raise them. We talked about. No, I am observing that there is a distinction that semonite observed between agencies that are submitted comments in their, or even outside organizations that have relevant expertise and are submitting comments as impartial objectors and not litigants in the course of action. And what this court described, and I am quoting as the typical, not in my backyard neighbors. And I think as much as they may be sovereign in many contexts, the relevance is limited in a context like semonite, where the issue is whether this is somebody who's objecting because this is happening in their backyard or whether they bring some expertise. And, you know, the comparison between this case and semonite, where the court described literally a deluge of unremitting criticism by expert agencies that have been designated by Congress with the trust to look after this resource, your gun lab at the Department of Energy, the conservancy. There's just not any, you know, remote comparison. But at the end of the day, what the court was looking to distinguish was the so-called heckler veto, or the person who's looking to object to anything in the agency's work, did not in my backyard neighbor, from people who are offering more scientifically based dispassionate. We don't have any case that has labeled a sovereign entity as a semonite status or heckler's veto, or heckler's veto in many cases have evolved. See, the question is not whether they're a sovereign entity. No, but I don't think that there is a question that has helped, you know, the country either. I mean, the question that the law asks is whether there is something plus beyond a bare objection by an affected neighbor. And that's what we have here. It's not just an affected neighbor, it's someone else in the federal government with a personal obligation, an interior obligation. And sure, and those obligations were examined, and according to the tribe, are yet to be examined in an appropriate... I'm not making that point. I'm making a different one about the status of the... No, but I understand the point. And the point I'm making is different, which is that, like it or not, there is a distinction between identifying people who have created a controversy that is based on expertise that has been recognized at some level impartial, and people who have what I might call a personal engagement backed up by litigation because they don't like the project. Those people may be governors or municipalities, which may be entitled to respect in other contexts. It takes nothing from them to acknowledge that, but it does require to... But certainly, it does fall upon us to recognize that they're also the knock-on-my-back-door neighbor. Yeah, okay. We have your point, Mr. Estrada. Thank you. All the cases submitted. Thank you, Your Honor.
judges: Tatel, Millett, Sentelle